**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RUSSELL PARTCH, Derivatively on Behalf of CENTRAL EUROPEAN DISTRIBUTION CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>WILLIAM V. CAREY, CHRISTOPHER BIEDERMANN, DAVID BAILEY, MAREK E. FORYSIAK ROBERT P. KOCH, MARKUS SIEGER, and WILLIAM S. SHANAHAN<br><br>Defendants,<br><br>and<br><br>CENTRAL EUROPEAN DISTRIBUTION, CORPORATION,<br><br>Nominal Defendant. | Case No.: _____<br><br>**JURY TRIAL DEMANDED** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Russell Partch, by his undersigned attorneys, submits this Verified Shareholder Derivative Complaint in the name and on behalf of nominal defendant Central European Distribution Company ("CEDC" or "the Company") against certain directors and officers of CEDC named herein (the "Defendants"). Plaintiff bases his allegations on personal knowledge as to his own acts and on information and belief as to all other allegations, based on due investigation by counsel, including: (a) review and analysis of public filings made by CEDC and other persons with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications cause to be disseminated by certain of the Defendants and

other persons; (c) review of news articles, shareholder communications, and postings on CEDC's websites concerning the Company's public statements; and (d) review of other publicly available information concerning CEDC and other persons.

## <u>INTRODUCTION</u>

1.     This is a shareholder derivative action brought by a shareholder of Central European Distribution Corporation on behalf of the Company against certain of its officers and directors seeking to remedy Defendants' violations of state law, including breaches of fiduciary duties, gross mismanagement, waste of corporate assets, and unjust enrichment, that occurred from October 2010 to November 2011 (the "Relevant Period") and which have caused substantial monetary losses to CEDC and other damages, including damages to its reputation and goodwill.  On behalf of CEDC, this action seeks damages, corporate governance reforms, an accounting, rescission, and the imposition of a constructive trust to remedy Defendants' violations of law.

2.     During the Relevant Period, Defendants caused CEDC to issue or make materially false and misleading statements concerning the Company's business operations and financial condition.  Additionally, Defendants caused CEDC to file materially false and misleading financial statements with the SEC.

3.     CEDC is a liquor manufacturer and distributor, and is the largest producer of vodka in the world. CEDC's products are distributed throughout Europe and much of the world, but Russia and Poland constitute the Company's primary vodka markets; with Russia accounting for 70% of CEDC's profits, and Poland accounting for 28% of CEDC's profits.

4.     In Russia, CEDC produces and markets the *Green Mark* brand, the top selling mainstream vodka in the world's largest consumer of vodka. It also sells the *Parliament* and

*Zhuravli* brands, the two top selling sub-premium vodka brands in the country. In Poland, the company produces and sells *Soplica*, *Palace*, *Absolwent*, *Bols*, and *Zubrowka* branded vodka.

5.     In November 2010, CEDC launched yet another line of vodka into the Polish market, *Zubrowka Biala* ("Biala"). Biala quickly became one of the fastest growing vodka brands in the Polish market, driven by discounts and rebates.

6.     Throughout CEDC's fiscal year 2010, the Defendants cozened shareholders with rosy predictions of the Company's financial health, pointing to, amongst other things, positive trends to be expected from the Biala rollout, and the expected increased market share in Russia resulting from the Russian government's crackdown on makers of bootleg vodka.

7.     During this period, the Defendants hid various pieces of key information from shareholders, including:

    a.     A dispute with the Russian government, stemming in part from excise tax stamps, led to a shutdown of CEDC's distillery in Russia during the month of November, 2010. This is the Company's key selling period, and nothing was produced, resulting is a $35 million charge;

    b.     Due to a loss of market share in key accounts to discounters, CEDC had experienced a double digit decline in its vodka portfolio;

    c.     CEDC would be need to take an impairment charge of $138 million, related to the dissolution in value of CEDC's Polish Brands, due to competition from CEDC's other product, Biala. It should be noted that the impairment charge was more than double the entirety of CEDC's net profits for 2009;

    d.     CEDC's reported a net loss of $92.9 million for fiscal year 2010, as compared to a profit of $72.7 million for fiscal year 2009.

8.      Upon the release of this information, CEDC's stock tumbled by 37% in a single day. By November, 10 2011, the Company's stock was trading at $2.93, a decline of nearly 90 percent from CEDC's per share price of $27.44 on December 2, 2010.

9.      These revelations, known to the Defendants for at least four months, were not promptly reported. Director Defendant William Carey took full advantage of the delay to sell 67,300 shares of CEDC stock for $1.763 million before the information was released.

10.      Furthermore, the Defendants ignored United States' Generally Accepted Accounting Principles ("GAAP") in failing to take timely impairment charges. The Defendants' failure to timely take these impairment charges have subjected CEDC to a complaint for violation of the federal securities laws, currently pending in this Court, and captioned *Steamfitters Local 449 Pension Fund v. Central European Distribution Corp.*, 1:11-CV-06247-JBS-KMW (D.N.J., filed October 24, 2011). In defending this action, CEDC has incurred investigator and ligation costs, and is faced with substantial potential liability for violations of securities law, and the costs of defending the suit.

## JURISDICTION AND VENUE

11.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.  All Defendants are completely diverse from Plaintiff and the amount in controversy exceeds $75,000.00.

12.      This Court has personal jurisdiction over each of the Defendants because each defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under the traditional notions of fair play and substantial justice.

4

13.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because (i) one or more of the Defendants either resides or maintains executives offices in the District; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in the District; and (iii) Defendants have received substantial compensation and other transfers of money in the District by doing business and engaging in activities having an effect in the District.

## PARTIES

**Plaintiff**

14.     Plaintiff is presently a shareholder of CEDC and has been a shareholder at all times necessary to the claims asserted herein.  Plaintiff is a citizen of Virginia.

**Nominal Defendant**

15.     Defendant CEDC is a corporation organized and existing under the laws of the State of Delaware, with its principal executive offices located at 300 Atrium Way, Suite 265, Mt. Laurel, New Jersey.

**Individual, Defendants**

16.     Defendant William V. Carey  ("Carey") is and was at all relevant times CEDC's President, Chief Executive Officer, and Chairman of the Board of Directors. Carey was a founder of CEDC. Because of his position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known of the wrongful conduct and adverse, non-public information about the business of CEDC including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Carey participated in the wrongful conduct and issuance

5

of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and CEDC shareholders.  During the Relevant Period, Carey sold 67,300 shares of Company stock on the basis of material nonpublic information for proceeds of over $1.7 million.  Carey received $1,706,996.00 million in salary and other compensation from CEDC in 2010.  Carey is a citizen of Florida.

17.     Defendant Christopher Biedermann ("Biedermann") is and was at all relevant times CEDC's Chief Financial Officer.  Because of his position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known of the wrongful conduct and adverse, non-public information about the business of CEDC including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Biedermann participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and CEDC shareholders.  Biedermann is a citizen of Poland.

18.     Defendant David Bailey ("Bailey") is and was at all relevant times, the Lead Director and Chairmen of the Audit Committee, and the Chairman of the Corporate Governance Committee for CEDC. Because of his position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known of the wrongful conduct and adverse, non-public information about the business of CEDC including its finances, markets and

present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Bailey participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and CEDC shareholders.  Bailey is a citizen of Poland.

19.    Defendant Marek E. Forysiak ("Forysiak") is a director and a member of the Audit Committee for CEDC. Because of his position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known of the wrongful conduct and adverse, non-public information about the business of CEDC including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Forysiak participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and CEDC shareholders.  Forysiak is a resident of citizen of Russia.

20.    Defendant Robert P. Koch ("Koch") is a director and a member of the Nominating and Corporate Governance Committee for CEDC. Because of his position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known of the wrongful conduct and adverse, non-public information about the business of CEDC including its finances, markets and present and future business prospects, via access to corporate

documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Koch participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and CEDC shareholders.  Koch is a citizen of Maryland.

21.    Defendant Markus Sieger ("Sieger") is a director and a member of the Audit Committee for CEDC. Because of his position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known of the wrongful conduct and adverse, non-public information about the business of CEDC including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Sieger participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and CEDC shareholders.  Sieger is a citizen of Switzerland.

22.    Defendant William S. Shanahan ("Shanahan") is a director and a member of the Nominating and Corporate Governance Committee for CEDC. Because of his position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known of the wrongful conduct and adverse, non-public information about the business of CEDC including its finances, markets and present and future business prospects, via access to corporate

documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.   During the Relevant Period, Shanahan participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and CEDC shareholders.  Shanahan is a citizen of Connecticut.

### GENERAL FIDUCIARY DUTIES OF THE DEFENDANTS

23.     The Defendants had stringent fiduciary obligations to CEDC and its shareholders.

24.     By reason of their positions as officers, directors and/or fiduciaries of CEDC and because of their ability to control the business and corporate affairs of CEDC, the Defendants owed CEDC and its shareholders fiduciary obligations of loyalty, good faith, due care, disclosure, candor, and oversight, and were and are required to use their utmost ability to control and manage CEDC in a fair, just, honest and equitable manner.  The Defendants were and are required to act in furtherance of the best interests of CEDC and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

25.     Each director and officer of the Company owes to CEDC and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's true forecasts and business prospects.

26.     The Defendants, because of their positions of control and authority as directors and/or officers of CEDC, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.   Because of their advisory, executive, managerial and directorial positions with CEDC, each of the Defendants had access to adverse, non-public information about the financial condition, operations, market demands for products, and improper representations of CEDC.

27.     At all times relevant hereto, each of the Defendants was the agent of each of the other Defendants and of CEDC, and was at all times acting within the course and scope of such agency.

28.     To discharge their duties, the officers and directors of CEDC were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the operational affairs of the Company.   By virtue of such duties, the officers and directors of CEDC  were required to, among other things:

a.      refrain from acting upon material, inside, corporate information to benefit themselves;

b.      conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

c.      properly and accurately guide shareholders and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company

maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.      ensure that the Company's revenue projections were based on appropriate support and documentation, and were routinely checked for accuracy;

e.      ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

f.      ensure that these were sufficient checks and balances in CEDC's accounting and finance functions, and related functions, to prevent accounting irregularities, internal control problems, and/or overstatement of revenue or asset values; and

g.      ensure that no inaccurate financial information about CEDC was released to the public that would tend to artificially inflate CEDC's stock, and that would thus cause corresponding or greater harm to the Company's value when the truth was revealed.

29.     Each of the Defendants, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, due care, disclosure, candor, and oversight in the management and administration of the affairs of the Company.  The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of CEDC, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders. The Defendants were aware, or should have been aware, that those violations, absences of good faith, and the reckless disregard of duties posed a risk of serious injury to the Company.  The conduct of the Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Defendants who collectively comprised all of CEDC's Board during the Relevant Period.

30.     Because of their positions with the Company, and their access to material non-public information available to them but not to the public, CEDC, through the Defendants, knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  As a result of defendant's illegal actions and course of conduct during the Relevant Period, the Company is now subject to multiple shareholder lawsuits that allege violations of both federal and state law.   As a result, CEDC has expended, and will continue to expend, significant sums of money.

## SPECIFIC FIDUCIARY DUTIES OF THE DEFENDANTS

### Duties Defined in CEDC's Code of Business Conduct and Ethics

31.     In addition to the general duties summarized above, CEDC's Code of Conduct and the charter of the Audit Committee also imposed specific duties on the Individual Defendants. As evidence of this CEDC's Code of Conduct requires that each member of the Company's management, its executives, and its directors, imposes the following duties, among others:

- This Code of Conduct is a statement by Central European Distribution Corporation ("CEDC") of the manner in which it intends to conduct its business activities. It sets forth the standards of conduct and ethics which CEDC requires of all of its directors, officers and employees and all of the directors, officers and employees of each of its subsidiaries.

- The Code of Conduct is intended to apply to all business activities conducted on behalf of the Company. The success of the Company is predicated on conducting its business affairs in a socially responsible manner, while seeking to promote the most important dynamic of a public company – earning the profits which make possible the continued existence and growth of the Company, satisfying investors' expectations of a fair return, providing jobs for employees and contributing to the well-being of the various communities in which the Company does business.

- Recognition of the public interest must be a permanent Company commitment in the conduct of its affairs. The activities of all of the Company's employees, officers and directors (collectively referred to as "Affiliates") acting on its behalf must always be in full compliance with applicable laws and governmental regulations. In this regard, no Affiliate should assist a third party in violating any applicable law or governmental regulation. When there is any doubt as to the lawfulness of any proposed activity, advice must be sought from the Company's Compliance Officer who, where appropriate, will confer with counsel to the Company. Specifically, the Company is committed to . . . complying with all applicable state and federal securities laws.

- Directors, officers and employees are prohibited from illegally trading the Company's securities while in possession of material, nonpublic ("inside") information about the Company.

- The Company is committed to promoting the values of honesty, integrity and fairness in the conduct of its business and sustaining a work environment that fosters mutual respect, openness and individual integrity.

- All financial transactions must be executed in accordance with management's general or specific authorization. The Company's books, records and accounts must reflect, accurately and fairly and within the Company's regular system of accountability, all of the Company's transactions and the acquisition and/or disposition of its assets. All transactions must be accurately recorded to permit the preparation of financial statements in conformity with United States generally accepted accounting principles consistently applied and other applicable rules, regulations and criteria, and to insure full accountability for all of the Company's assets and activities. Under no circumstances may there be any unrecorded Company funds or assets, regardless of the purpose for which the funds or assets may have been intended, or any improper or inaccurate entry knowingly made on the Company's books and records. No payment on behalf of the Company may be approved or made with the intention or understanding that any part of the payment is to be used for a purpose other than as described by the documents supporting the payment.

- Company assets must be safeguarded not only against inadvertent loss, but also against intentional misappropriation. Assets include not only cash, fixtures, furniture and equipment, but also merchandise, business and product plans, trade secrets and other proprietary or confidential information and related matters.

13

### 1.    SECURITIES TRADING

- *Inside Information.* Affiliates may not disclose material nonpublic (i.e., "inside") information concerning the Company to anyone not employed by the Company, or to any Affiliate who has no business need for such information, unless and until the information has been publicly released by the Company.

- Affiliates are also prohibited from buying or selling, directly or indirectly through third parties, the publicly-traded securities of any company, including the Company, on the basis of material nonpublic information concerning, or obtained directly or indirectly from or through, the Company.

- *Trading Guidelines.* Investment by Affiliates in the Company's stock is generally desirable and should not be discouraged. However, such investments must be made with caution and with recognition of the legal prohibitions concerning the use by corporate "insiders" of confidential information for their own profit. Guidelines to aid employees in determining when trading in the Company's stock are appropriate are set forth below. It should be noted that "trading" includes not only purchases and sales, but also exercises of options, warrants, puts and calls, etc. The prohibition on the use of material inside information also extends to the securities of other entities, such as Related Companies, as to which an Affiliate may become in possession of non-public information in the course of his or her employment by the Company.

- An Affiliate may not trade if the Affiliate has knowledge of material information about the Company which has not been made widely available to the investing public. If there are questions whether information may be material, or if it has not been made widely available to the investing public, the matter should be discussed with the Company's Director of Investor Relations who, where appropriate, will confer with counsel to the Company. Once information has been released by the Company, an Affiliate must still refrain from trading until sufficient time has passed to insure that the information has been made widely available to the investing public. In most cases, an Affiliate should refrain from trading until 48 hours after release by the Company of the information. If there are questions as to whether it is appropriate to trade in given circumstances, the Affiliate should contact the Director of Investor Relations for advice before trading.

- Directors of the Company and officers who have been designated by the Board of Directors as "officers" for securities law reporting purposes ("Executive Officers") must always obtain prior permission from the Director of Investor Relations before trading. Other officers may trade if no limitation on trading has been declared and the officer does

not possess any material information about the Company which has not been publicly disclosed.

### 2.    ACCURATE AND TIMELY PERIODIC REPORTS

The Company is committed to providing investors with full, fair, accurate, timely and understandable disclosure in the periodic reports that it is required to file. To this end, the Company shall:

- comply with United States generally accepted accounting principles at all times;
- maintain a system of internal accounting controls that will provide reasonable assurances to management that all transactions are properly recorded;
- maintain books and records that accurately and fairly reflect the Company's transactions;
- prohibit the establishment of any undisclosed or unrecorded funds or assets;
- maintain a system of internal controls that will provide reasonable assurances to management that material information about the Company is made known to management, particularly during the periods in which the Company's periodic reports are being prepared; and
- present information in a clear and orderly manner and avoid the use of legal and financial jargon in the Company's periodic reports.
- It is important that each Affiliate comply not only with the letter but, equally importantly, with the spirit of this Code. If an Affiliate believes that another Affiliate is acting in a manner that is not in compliance with this Code, or that he or she has been requested to act in such a manner, this circumstance should immediately be reported, in person or in writing, to the attention of the Compliance Officer who, where appropriate, will confer with counsel to the Company. In order to encourage uninhibited communication of such matters, such communications will be treated confidentially to the fullest extent possible and no disciplinary or other retaliatory action will be taken against any Affiliate who acts in good faith in communicating such matters.

### Duties of the Audit Committee

32.    The Charter of the Audit Committee also imposes upon the members of that Committee, in part, the following duties:

The Audit Committee (the "Committee") is established to assist the Board of Directors (the "Board") in fulfilling its legal and ethical compliance oversight responsibilities, including

oversight of: (i) the integrity of CEDC's financial reporting process; (ii) the system of internal controls over financial reporting; (iii) the audit process; and (iv) the process for monitoring compliance with all applicable laws and regulations (principally those of the U.S. Securities and Exchange Commission, or "SEC"). The Committee provides an open avenue of communication between financial management, internal auditors, the independent or external auditors and the Board. The Committee is authorized to: (i) consult directly with the independent auditors and such other persons as the Committee deems appropriate; (ii) review the preparations for and scope of the audit of CEDC's financial statements and review drafts of such statements; (iii) recommend any action to the Board that the Committee deems appropriate; and (iv) perform such other duties relating to the financial statements and other matters of CEDC as set forth below and as the Board may assign from time to time.

The Committee is authorized to carry out the responsibilities set forth below. In carrying out its responsibilities and duties, the Committee must rely on the knowledge and expertise of management, the internal auditors and the independent auditors. Management and CEDC's internal auditors are ultimately responsible for determining whether CEDC's financial statements are complete, accurate and prepared in accordance with generally accepted accounting principles. The independent auditors are ultimately accountable to the Committee and the entire Board for such auditors' review of the financial statements and controls of CEDC.

- Review the annual audited financial statements with management and the independent auditors including: (i) the preparations for and scope of the independent audit of the financial statements; (ii) issues regarding accounting and auditing principles and practices; and (iii) the adequacy of internal controls that could significantly affect CEDC's financial statements.

- Review critical accounting policies and any major accounting policy changes. The Committee must receive reports on alternative accounting treatments from the independent auditors as may be relevant to CEDC's financial statements. This will include accounting policies in the United States and in Poland or any other country where CEDC conducts its operations.

- Review with the management and independent auditors the quarterly financial statements before filing of CEDC's reports on Form 10-Q and Form 10-K, including the results of the independent auditor's reviews of the quarterly financial statements and SAS/71s.

- Establish and maintain procedures allowing employees of CEDC to submit any concerns regarding questionable accounting or auditing matters on a confidential, anonymous basis.

- Periodically review the adequacy and effectiveness of accounting personnel within CEDC, the adequacy and effectiveness of internal accounting and financial controls of CEDC and elicit any recommendations for the improvement of such internal controls or particular areas where new or more detailed controls or procedures are desirable. Particular emphasis must be given to the adequacy of internal controls to expose any payments, transactions or procedures that might be deemed illegal or otherwise improper.

- Review with management and the independent auditors any correspondence with regulators or governmental agencies and any employee complaint or published reports that raise material issues regarding CEDC's financial statements or accounting policies.

- Conduct or authorize investigations into any relevant financial matters within the scope of the Committee's responsibilities and duties under this Charter or as the Board may assign to the Committee from time to time. The Committee is empowered to (i) retain outside counsel, accountants or others to advise or assist the Committee in the conduct of an investigation; (ii) seek any information it requires from external parties or employees, all of whom are directed to cooperate with the Committee's requests; (iii) meet with the management, independent auditors, or outside counsel as necessary; and (iv) meet with CEDC's financial advisors.

- The Committee's reporting responsibilities will include reports to the Board about the Committee's activities, issues and related recommendations, and preparation of the report to be included in CEDC's annual proxy statement describing CEDC and its activities, as required by the SEC.

## FACTUAL ALLEGATIONS

### Company Background

33.     CEDC is a marketer of intoxicating spirits, and is the largest marketer of vodka in the world. In addition to marketing spirits, CEDC also manufactures vodka at distilleries in Russia and Poland.

34.     CEDC's brand Zelyonaya Marka is the number one vodka brand in Russia, and the number 2 vodka brand in the world. In addition to Zelyonaya Marka, CEDC also manufactures Parliament and Zhuralvi, two of the leading sub-premium Russian vodka, and Yamskaya, the number one economy brand in Russia.

35.     CEDC's brand Bols is the highest selling premium vodka in Poland, and its products Soplica, Zhuravli, and Zubrowka are some of the highest selling Polish vodkas.

36.     In November of 2010, CEDC launched another line of Polish vodkas under the trade name Zubrowka Biala.

**Defendants Cause CEDC to Make False and Misleading Statements**

37.     The Defendants named herein breached their fiduciary duties by causing and allowing CEDC to issue public statements which did not accurately portray CEDC's true fiscal position and business prospects.

38.     On August 5, 2010, CEDC issued a press release discussing its financial results at the close of the second quarter of CEDC's fiscal year.   This release contained improper statements by Defendants Carey and Biedermann, and read in its pertinent part, with emphasis added:

> CEDC today announced its results for the second quarter of 2010. Net sales for the three months ended June 30, 2010 were $175.6 million as compared to $175.9 million reported for the same period in 2009. Operating profit on a comparable basis for the second quarter 2010 was $44.7 million as compared to $36.3 million for 2009….Operating profit on a U.S. GAAP basis for the second quarter 2010 was $41.2 million as compared to $242.6 million for 2009…

> William Carey, President and CEO commented, ***"We have started to see more robust demand from the consumer in our largest market, Russia (which represents approximately 75% of our net income), our volumes were up 7.5% from vodka and imports from the Whitehall Group were up 14% in volume***

*terms during the second quarter of 2010.* The bulk of the growth in demand for our vodka portfolio is still coming from a lower price point as compared to the second quarter 2009, but pricing seems to have stabilized and gross margins remain above 50% . We have also seen strong Parliament Vodka distribution gains, post integration, in the second quarter with Parliament vodka up 14% in volume. There has been continued strong interest from the vodka consumer in Russia for our new mainstream/economy brands that we launched last fall, and we are still realizing strong distribution gains for these brands over the last nine months. Our core economy brand, Yamskaya, is ranked as one of the fastest growing brands in Russia today and is expected to achieve over three million nine liter cases in 2010 (a 25% increase over 2009). Although the product mix has had a slight negative impact on our gross margin percentages this has been more than offset by a declining SG&A base resulting in our core operating profit as a percent of sales in Russia expanding by over 400 basis points over 2009 second quarter results."…

William Carey, President and CEO continued, *"In Russia the overall vodka market has been positively impacted by strong government controls that have been put in to reduce the grey market. The controls that are taking place affect the producers of raw spirit, vodka manufacturers, retailers and wholesalers. We are still estimating that from the shift from grey market to legal market that the overall legal vodka market will grow this year with overall consumption including the grey market down approximately one to three percent*. Based upon Gosstat data, the legal vodka market is up one percent for the six months ending June 30, 2010. *We expect that the growth of the legal vodka market to come primarily from the value sector where people are shifting from the grey market, but as real wage inflation continues its positive trends we expect mainstream/sub-premium sectors to benefit medium term.*"

William Carey, President and CEO continued, "*The Polish consumer was hit with a number of external events that we believe had a significant impact on the Polish vodka market generally and our results. The quarter began with the tragic accident involving the death of the Polish President and other high ranking officials followed by a few weeks of mourning, massive flooding took place in the southern part of Poland and record high temperatures that began in June. Our vodka volumes for the quarter were down approximately 12% and were partially offset by increases in our import and export businesses.* We were able to continue to reduce SG&A as a percent of sales on a comparable basis by

over 100 basis points, translating into operating profit margins of over 50 basis points higher as compared to the prior year period. Management is extremely focused on improving the volume numbers in Poland and with a major launch of a new mainstream/subpremium vodka brand planned for the fourth quarter of this year and improved execution; we believe we are on track to deliver increased top line growth and a continued improvement in our operating profit margins."

Chris Biedermann, Vice-President and CFO, continued, "As announced earlier this week, we completed the final disposal of our Polish Wholesale business to Eurocash. As part of this sale process and the separation of this business we have completed our final split of the 2010 Poland sales forecast of clients that will be sold directly through CEDC or the disposed Polish wholesale business. The result of this final sales split provides for an increased shift of the wholesale revenue of approximately $136 million (grossing up excise for the wholesale business) and revised reduction of $711 million (previous $575 million) from our initial full year 2010 net sales guidance. The operating profit impact of this change will be less than $1 million annually. *As a result of this change we are updating our full year net sales guidance from $900 - $1,050 million to $764 million to $914 million and keeping full year fully diluted earnings per share guidance unchanged at $2.10 -$2.20. We are also maintaining our full year guidance for operating profit excluding depreciation of $262 million."* [Emphases added.]

39.     Thus, Defendants Carey and Biedermann presented a bright picture of CEDC's future, pointing to one-off events as the reason for the Company's less than stellar performance.

40.     On November 5, 2010, CEDC announced its third quarter financial results. While the results were mediocre at best, the Defendants continued to represent a rosy outlook for CEDC's future, and to point to one-time events as the reason for the company's mediocre performance. The press release accompanying the results stated, in pertinent part, with emphasis added, that:

Central European Distribution Corporation (Nasdaq: CEDC) today announced its results for the third quarter of 2010. Net sales for the three months ended September 30, 2010 were $157.8 million as compared to $187.5 million reported for the same period in 2009. Operating profit on a comparable basis for the third

quarter 2010 was $32.5 million as compared to $43.5 million for 2009. On a comparable basis, CEDC announced net income, excluding discontinued operations of $8.5 million, or $0.12 per fully diluted share, for the third quarter of 2010, as compared to $27.2 million, or $0.49 per fully diluted share, for the same period in 2009. CEDC also announced net profit on a U.S. GAAP basis (as hereinafter defined), excluding discontinued operations, for the quarter was $68.9 million or $0.98 per fully diluted share, as compared to net profit of $45.4 million or $0.83 per fully diluted share, for the same period in 2009. Operating profit on a U.S. GAAP basis for the third quarter 2010 was $29.1 million as compared to $27.0 million for 2009. The number of fully diluted shares used in computing the earnings per share was 70.6 million for 2010 and 55.5 million for 2009. For a complete reconciliation of comparable net income to net income reported under United States Generally Accepted Accounting Principles ("U.S. GAAP") and comparable operating profit to operating profit reported under U.S. GAAP, please see the section "Unaudited Reconciliation of Non-GAAP Measures."

William Carey, President and CEO commented, "We were disappointed by the results in the 3rd quarter of 2010 which were *a result of a combination of factors including external events, currency movements, commodity prices and negative sales mix that occurred in our core markets.* After seeing solid volume growth coming from the 2nd quarter of 2010, we were expecting a continuation of these positive volume trends into the 3rd quarter. The expected positive trends from the 2nd quarter were heavily impacted by the record heat wave across Eastern Europe and fires which spread across key parts of Russia. These factors resulted in an estimated reduction in the vodka market in volume terms during this period by an estimated 6%-8% in Poland and 12%-15% in Russia as compared to the prior year. We were able to see strong volume and market trends in September; however, these trends were not sufficient to cover the shortfall for the first two months of the quarter."…

William Carey, President and CEO continued "Over the last six months, we have seen continued improvement in consumer demand and sentiment in Russia as well as a positive outlook from a macro view in Russia… William Carey, President and CEO continued "As we are now in our biggest quarter of the year in terms of revenue and profitability we are forecasting high single digit volume growth and double digit value growth (taking into account recent price increases) for this quarter from our overall portfolio. We have seen a stabilization of commodity prices since September, and we believe we will continue to benefit from a much

lower cost base this quarter and beyond. Although the 3rd quarter was a huge disappointment for us, our management team is extremely focused on delivering on these 4th quarter objectives, and we believe the worst is behind us."… The Company also announced it has updated its full year 2010 net sales guidance from $764 - $914 million to $730 -$780 million and its full year comparable fully-diluted earnings per share guidance from $2.10 -$2.20 to $1.50 -$1.70. This revised guidance includes exchange rates assumptions based upon recent market rates. The number of fully diluted shares used in computing the full year 2010 guidance is approximately 70.5 million.  [Emphasis added.]

41.     Thus, CEDC, by and through Defendants Carey and Biedermann, downplayed any risks to CEDC's future. In doing so, the Defendants blithely failed to report on significant events which would have a substantial impact on the Company's financial health, including:

a.   CEDC's Polish vodka portfolio had experienced double digit declines, and that the Company was continuing to lose significant market share to Polish liquor discounters;

b.   CEDC would need to take an impairment charge due to the severity of the decline, which the Defendants neglected to mention or record in a timely fashion pursuant to GAAP;

c.   CEDC's new Polish vodka, Biala, was having a material adverse effect on gross margin, both from increased marketing spending, as well as cannibalization of CEDC's existing vodka brands.

**The Truth is Revealed**

42.     On March 1, 2011, CEDC issued a press release discussing its fiscal year end results. The press release stated, in pertinent part:

CEDC announced a net loss from continuing operations on a U.S. GAAP basis (as hereinafter defined) for the year of $92.9 million or $1.32 per fully diluted share, as compared to net profit of $72.7 million or $1.35 per fully diluted share, for the

same period in 2009. On a comparable basis, CEDC announced net income from continuing operations of $38.7 million, or $0.55 per fully diluted share, for the full year 2010, as compared to $118.9 million, or $2.20 per fully diluted share, for the same period in 2009. The number of fully diluted shares used in computing the full year earnings per share was 70.3 million for 2010 and 54.0 million for 2009.

The net loss from continuing operations on a U.S. GAAP basis for the 4th quarter of 2010 was $103.2 million or $1.46 per fully diluted share, as compared to net loss of $95.3 million or $1.51 per fully diluted share, for the same period in 2009. On a comparable basis, CEDC announced net income of $12.2 million, or $0.17 per fully diluted share, for the 4th quarter 2010, as compared to $70.6 million, or $1.12 per fully diluted share, for the same period in 2009.

William Carey, President and CEO, commented, "*We faced a number of key challenges and strategic decisions in our core markets during the fourth quarter. In Poland we had our biggest new product launch ever with Zubrowka Biala, which was tremendous success and continues to be, however at the expense of bottom line profitability during the fourth quarter*. We also took the decision to invest more behind our core <u>vodka</u> brands later in the quarter to start to reverse a two year slide of market share. We have been very encouraged by seeing our market share gain from 20.2% in November 2010 to 25.2% in January 2011. *In Russia, we faced a production issue in November that halted a significant portion of our production needs for approximately two weeks during our peak selling period. We were very encouraged that we were able to make up a large part of this lost revenue in December, but which came at the expense of gross margin and added logistics and over-time costs, that substantially reduced the profitability of the quarter.*" [Emphases added.]

43.     Later that same day, CEDC hosted a conference call, in which further revelations of the Company's true position were revealed. During the conference call, Defendant Carey stated, in pertinent part, with emphasis added:

**William Carey - Chairman, CEO and President**:…welcome everyone to the fourth quarter 2010 and full year earnings call. I'll just start off and sort of give you an overview from the earnings that were reported today for 2010 and comment on what we're looking at as an overview for Poland and Russia, and then I'll get into a bit the fundamentals in Q4…

The Biala launch was extremely successful, but certainly a negative implication on our bottom line as the brand grew 2.5 times more than we estimated, and as we have put out the promotional plan in place, we couldn't just turn off this ticket or reduce the plan as the brand was doing extremely well, not just selling at the market, but really rotating in the marketplace, but because of the investment program behind it, it was running a negative comp, and ***certainly also that it does cannibalize the growth in this brand, it does cannibalize about 30% to 35% of our other portfolio.***

Certainly these added investments in the quarter stopped our market share slide and reduced our – ***we had double digit declines as you saw in the last few quarters of our vodka portfolio***, certainly that's been reduced, and this year we're certainly looking at much more positive numbers once we get into 2011, I'll take you through Poland in terms of the projections. Also in Poland that we've been working up off a negative client mix for probably the last five years. That's mainly from the discounters and key accounts taking share. This also had a negative effect in the fourth quarter, but this certainly has been stabilizing in the last few months. What we're seeing in 2011 also is already stabilizing, where also there we've doubled the size of our sales force in the traditional trade, so what we're seeing also is our overall client mix is improving as we move into 2011.

So just to summarize the top line, certainly it did come with a large expense to the bottom line profitability. In terms of the EBIT coming out of the fourth quarter, it was impacted mainly by spirit price a bit; currency; the volume as I said; also that we had some bad debt expense, as we changed some of our accounting policy, which Chris will get into; and also a bit on the client mix; ***but the bigger hit certainly has come from Biala***, which is the added investment with the launch, and also the added investment on our other brands to really turnaround what we are as a company in Poland and start back on a growth picture, and not on a declining top line picture.

If you look at the Russian market Q4, with 8% volume increase for Q4 in an overall market which was flat for the quarter, this represent about 0.4% market share gain. The one key issue that stood out for us in Q4 in Russia – one was the top line was a bit softer than we anticipated, but the main reason being also coming from the fact that ***we had an excise stamp issue in production, where we had a dispute with authorities on an old excise stamp count, where you must rectify or you must agree with the authorities every so often on getting the old excise count stamp (indiscernible) used all the stamps, and there was a dispute which we are proven correct at the end of the day, but it did certainly cost us in our overall production runs.***

***We lost two weeks of limited production runs with one week having nothing produced in the middle of November, which is our key selling period. We were scrambling after that period to make up this loss, and we are hoping we could***

*make up this loss, but unfortunately there it did hit our bottom line quite dramatically as we had to give extra discounts in the marketplace, and a bit extra credit days to make up for some of this lost period of time that we were affected*. Also our operating costs were affected because we were scrambling to meet the logistics needs, and Russia is very difficult in December on a normal base on logistics because we were making up for some of the loss in November on the production also an affect of some of the staff overruns and certainly our logistics overheads. We were not able also to make the product mix before of this – maximize the product mix that we were expecting because we were probably running behind from this issue.  [Emphases added.]

44.     Thus, for the first time, the Company revealed several key important facts, including; the double digit decline of CEDC's Polish vodka portfolio, the necessity of CEDC taking an impairment charge, and that Biala was cannibalizing some 30 to 35% of the company's vodka sales in Poland.

45.     In addition, the Company revealed, for the first time some three months after the fact, that CEDC's Russian distillery had been shut down for two weeks in November, during CEDC's peak production period.

46.     In response to these revelations, CEDC's share price plunged. CEDC's adjusted close price the day before the revelations was $22.85; on March 1st it plunged to $14.33, losing approximately a third of its value.

**The Mismanagement Continues**

47.      On November 4, 2011, CEDC announced an operating loss of $645.2 million, related primarily to "an impairment charge for goodwill and trademarks of $674.5 million." This impairment charge included $128 million for CEDC's Polish brands, "primarily Bols Vodka, due to among other factors cannibalization of volumes from recently launched brands such as Biala."

48.     CEDC has missed earnings estimates for three straight quarters, and has approximately $1.3 billion in debt. The company is now listed as a B- by Moody's, and continual downgrades make further profitability a difficult task at best.

49.     By late 2011, the Company still had not presented a plan to adequately address how it will pay back debt.

50.     CEDC's share price continued to plummet, until by November 10th, 2011, the stock closed at $2.93 per share, a decline of 87.2% of the stock's total value.

**Insider Trading by Defendant Carey**

51.     Through a three day trading period; from December 9 to December 13, 2010, Defendant Carey sold over $1.7 million worth of stock. He was privy to information not available to the public, such as the two week shutdown of the Company's Russian distillery, and was able to liquidate some of his holdings while the stock was trading at an artificially high volume. Carey's trades were as follows:

| Insider Last Name | Transaction Date | Shares | Avg. Price | Proceeds |
|---|---|---|---|---|
|  |  |  |  |  |
| **Carey** | 12/9/2010 | 24,800 | $25.7308 | $638,124.30 |
|  | 12/10/2010 | 22,500 | $25.3917 | $571,313.68 |
|  | 12/13/2010 | 20,000 | $25.8074 | $516,147.93 |
|  |  |  |  |  |
| **Total:** |  | **67,300** |  | **$1,725,585.91** |

52.     As a result of the many materially false and misleading statements, the Defendants have exposed CEDC to liability under the federal securities violations and various state laws.  The Company is now exposed to millions of dollars in defense costs and potential liability.

26

53.     CEDC shareholders have also carried the burden of Defendants' gross mismanagement of the Company.  As a result of Defendants' repeated breaches of fiduciary duty and egregious misconduct, as described above, the price of the Company's stock has plummeted and has yet to recover.  On November 10, 2011, the Company's stock closed at $2.93 per share.  As of January 24, 2011, the stock price has yet to recover.  On this day, CEDC's stock price closed traded mid-day at only $3.85 per share.

## DERIVATIVE ALLEGATIONS

54.     Plaintiff brings this action derivatively in the right and for the benefit of CEDC to redress injuries suffered, and to be suffered, by CEDC as a direct result of the violations of state law, including breaches fiduciary duty, abuse of control, and unjust enrichment, as well as the aiding and abetting thereof, by Defendants.

55.     CEDC is named as a nominal defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.   Plaintiff was a shareholder of CEDC at the time of the transgressions complained of.  Plaintiff will adequately and fairly represent the interests of CEDC and its shareholders in enforcing and prosecuting their rights.  Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

56.     The wrongful acts complained of herein subject, and will continue to subject, CEDC to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

57.     The wrongful acts complained of herein were unlawfully concealed from CEDC's shareholders.

58.     Throughout the relevant period, the Defendants violated multiple Corporate Governance Principles, thus representing evidence of defendants' breaches of fiduciary duties. The course of action related misrepresenting the financial integrity of the Company, and caused the defendants to breach the following Corporate Principles, among others:

- Directors, officers and employees are prohibited from illegally trading the Company's securities while in possession of material, nonpublic ("inside") information about the Company. comply with United States generally accepted accounting principles at all times;
- maintain books and records that accurately and fairly reflect the Company's transactions;
- maintain a system of internal controls that will provide reasonable assurances to management that material information about the Company is made known to management, particularly during the periods in which the Company's periodic reports are being prepared; and

59.     Plaintiff has not made any demand on the CEDC Board to institute this action since such demand would be a futile and useless act because the wrongful acts complained of herein show a wholesale abandonment by defendants of their fiduciary duties of due care and oversight.  Such abandonment includes, but is not limited to the following:

(a)     Allowing insiders to dispose shares before news of the Company's financial woes became known to shareholders;

(b)     Allowing for materially inadequate controls over the Company's policies and practices with respect to accounting for inherent corporate value, goodwill, and asset valuations; and

(c)     Allowing the Company's financial statements to be artificially inflated;

(d)     Allowing the Company to fail to disclose pertinent, material, and important information, in a timely manner, regarding the cessation of vodka production.

60.     These acts, and the other improper acts set forth herein, which demonstrate a pattern of misconduct, were not, nor could they have been, the product of a valid or good faith exercise of business judgment.

61.     Whenever a director is entrusted to make a decision about a corporate transaction in which that director has a financial interest, the entire fairness doctrine is triggered.  That doctrine carries a presumption that the transaction was accomplished to favor the interests of the director over the corporation, and the director carries the burden of demonstrating that the transaction was actually entirely fair to the corporation.  Given that presumption and burden shifting, the business judgment rule is rebutted, and demand is not required.

62.     As detailed above, the Board members were directly involved in the misconduct challenged in this action, by virtue of their respective positions on the Board and its Committees, or they completely abdicated their responsibility to oversee the Company's operations and let management run roughshod over the Company for their personal gain and causing the Company to engage in illegal and/or improper conduct that rendered the Company's public disclosures misleading, destroying in their wake, much of the Company's shareholder value.   The Defendants' conduct lacked any legitimate business purpose and was not a product of a valid exercise of business judgment.  As such, demand is excused as futile.

63.     In addition, Defendant Carey will take no action against the remainder of the CEDC Board, and they will take no action against him, because Defendant Carey was the CEO, President, and Chairman of the Board member, and president and the person at CEDC who dominated and controlled the Company during the majority of the relevant period.  As CEO, Defendant Carey was compensated handsomely throughout much of the Relevant Period, despite numerous false and misleading statements and continued breaches of fiduciary duties.  Due to his

compensation package, awarding Carey with millions of dollars, he will take no action against the remaining CEDC directors.  Therefore, demand as to Defendant Carey is excused.

64.     Defendant Carey will also take no action against the other members of the Board of Directors because he, together with the other senior managers of CEDC being sued herein, were directly responsible for the illegal acts and practices complained of herein, thus any pursuit demand upon the members of the Board of the Company to take the actions requested by Plaintiff herein must necessarily be excused.

65.     Moreover, by virtue of their respective positions on the Board, all the Defendants either knew of should have known about the Company's disregard for generally accepted accounting principles.  Therefore, a majority of the Board are either directly responsible for the Company's practices or were derelict in carrying out the express oversight duties with which they were charged.  As such, demand is excused as futile.

66.     Furthermore, Defendants Bailey (Chair), Sieger and Forysiak, as the current members of the Audit Committee, Defendant Carey as President, CEO, and Chairman of the Board, and Defendant Biedermann as CFO of CEDC, during the relevant period were responsible for ensuring that the Company's internal controls over safety, compliance, and financial reporting were adequate and that the Company's quarterly and annual financial statements were accurate.  Thus, the Audit Committee was directly responsible for approving, and the President, CEO and CFO was a signatory to, the Company's failure to comply with accounting principles and to issue materially false and misleading financial statements. Therefore, there is significant doubt that these Defendants are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duties, including their duties of good faith, fair dealing and loyalty, as well as other violations of law.  As such, the Defendants

Bailey, Sieger, Forysiak, Carey, and Biedermann are not disinterested or independent, and are not capable of responding adequately to a demand.  Demand on them is therefore excused.

67.     Indeed, the adoption of the Sarbanes-Oxley Act also placed significant additional responsibilities on the Board of Directors of CEDC, to improve corporate financial, accounting and internal controls, and to improve corporate financial responsibility and disclosure.  Thus, despite the CEDC Board's public posture of concern over good corporate governance, controls, disclosure integrity and overall compliance with the Sarbanes-Oxley act, in fact, at all relevant times, defendants had caused or allowed the falsification of the Company's reported financial results.  Any real compliance with Sarbanes-Oxley, would have exposed defendants' scheme, brought it to an end and resulted in embarrassing discharges and disclosures.  Thus, the Board of CEDC did not enforce or comply with Sarbanes-Oxley, despite its legal obligation under U.S. law to do so, and they will not now sue themselves for their failures to achieve such compliance.

68.     Furthermore, the CEDC Board is still dominated and controlled by the exact same wrongdoers who continue to obscure their own misconduct, and will not take action to protect the interests of CEDC or its shareholders.  The present Board has refused, and will continue to refuse, to institute this action for the foregoing and following reasons:

(a)     The acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and these acts are incapable of ratification;

(b)     Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Board of Directors.  Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action;

(c)     The acts complained of herein are illegal and improper and thus are acts incapable of ratification;

(d)     In order to bring this action for breach of fiduciary duty, abuse of control and fraud, the members of the Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who have personal relationships and with whom they have entangling financial alliances, interests, and dependencies, which they would not do.  They therefore would not be able to vigorously prosecute any such action; and

(e)     The members of the CEDC Board, including each of the Defendants herein, receive substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their control of CEDC. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.  The Board members also have close personal or business ties with each other and are, consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves.

69.     Demand is also be excused as to all of the members of the Board of Directors of the Company because each member of the Board either knew or was reckless or negligent in not knowing of the illegal and improper disclosure practices that were sanctioned and approved at the Company throughout the Relevant Period.  The Defendants will not now take action against

the other members of the Board of Directors of CEDC because each of these defendants engaged in or allowed CEDC to obfuscate the Company's financial position.

70.     Because Defendant Carey received a personal financial benefit from the challenged insider trading transactions, Care is also interested.  Also, Defendant Carey faces a sufficiently substantial threat of liability for breach of their fiduciary duties for insider selling. Since these directors have breached their fiduciary duties and are interested, any demand upon them is futile.

71.     Moreover, each of the Defendants, as an officer or director of CEDC, had intimate knowledge of all major operations of the Company, and yet he participated in dissemination of material misstatements of the Company's financial information.  Thus, defendants all have a personal interest in concealing any blame for CEDC's internal control problems, and away from himself for consciously disregarding fiduciary duties.  An investigation or inquiry that spread blame higher up the corporate ladder — to the officers or directors — would not be in the personal interest of defendants.  The result of such an inquiry would require them to return valuable but unearned compensation to the Company.

72.     In addition, all defendants face a sufficiently substantial likelihood of liability, and, thus, there is a reasonable doubt as to his disinterestedness in deciding whether pursuing legal action would be in the Company's best interest.

## COUNT I

### Derivatively Against All Defendants for Breach of Fiduciary Duty

73.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

74.     Defendants owed and owe CEDC fiduciary obligations.  By reason of their fiduciary relationships, defendants owed and owe CEDC the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

75.     Defendants, and each of them, violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

76.     Each of the defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

77.     Defendants caused or allowed CEDC to lack requisite internal controls, and, as a result, the Company's projections and reported results were based upon defective assumptions, manipulated facts, and/or fraudulent accounting practices.

78.     Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company.

79.     Defendants caused or allowed financial statements to be materially misstated.

80.     Defendants caused or allowed CEDC's relevant period financial statements, to be materially misleading and not prepared in accordance with GAAP principles.

81.     Defendants caused or allowed CEDC to fail to disclose pertinent and material information.

82.     As a direct and proximate result of the defendants' failure to perform their fiduciary obligations, CEDC has sustained significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

### Derivatively Against All Defendants for Abuse of Control

83.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

84.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence CEDC, for which they are legally responsible. Among the abuses of control was: (i) defendants' failure to supervise, and to exert internal controls over, and conscious disregard of responsibilities involving proper accounting of the Company's financial operations and (ii) defendants' reckless and/or grossly negligent failure to properly utilize corporate wide stress tests to determine whether or not the Company's stated financials were properly accounted for in accordance with the Company's policies.

85.     As a direct and proximate result of defendants' abuse of control, CEDC has sustained significant damages.

86.     As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT III

### Derivatively Against All Defendants for Gross Mismanagement

87.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

88.     By their actions alleged herein, defendants, either directly or through aiding and abetting one another, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of CEDC in a manner consistent with the operations of a publicly held corporation.

89.     Defendants caused or allowed CEDC to lack requisite internal controls, and as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated accounting procedures.

90.     Defendants caused or allowed the Company's financial statements to be materially misstated due to the Defendants' failure to properly account for the Company's real estate holdings and other financial measurements.

91.     Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company financial statements, as well as the Company's safety and compliance practices.

92.     Defendants caused or allowed financial statements to be materially misstated.

93.     Defendants, including members of the Audit Committee, did not take seriously their primary responsibility for the Company's safety, compliance, and financial reporting activities.

94.     As a direct and proximate result of defendants' gross mismanagement and breaches of duty alleged herein, CEDC has sustained significant damages in excess of hundreds of millions of dollars.

95.     As a result of the misconduct and breaches of duty alleged herein, the defendants are liable to the Company.

## COUNT IV

### Derivatively Against All Defendants for Waste of Corporate Assets

96.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

97.     As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, the defendants have caused CEDC to waste valuable corporate assets by incurring potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

98.     As a result of the waste of corporate assets, defendants are liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all of defendants and in favor of CEDC for the amount of damages sustained by the Company as a result of defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and negligence.

B.      Directing CEDC to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect CEDC and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions amendments to CEDC's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies, including measures to:

i.   Strengthen the Board's supervision of accounting and legal compliance by the company, including the development of procedures for greater shareholder input into the policies and guidelines of the Audit Committee;

ii.  Permit the CEDC shareholders to nominate at least two candidates to the Audit Committee.

iii.  Remove Defendant Carey from his role as Chairman and CEO of

CEDC.

C.      Awarding to Plaintiff the costs and disbursements of the action, including

reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

D.      And such other relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: February 1, 2012                **BRICKFIELD & DONAHUE**

By: /s/ Paul B. Brickfield, Esq.
Paul B. Brickfield (PB 1355)
*pbrickfield@brickdonlaw.com*
70 Grand Avenue, Suite 100
River Edge, New Jersey 07661
Telephone: (201) 488-7707
Fax:  (201) 488-9559


**KAHN SWICK & FOTI, LLC**
Albert M. Myers (*pro hac vice* application to be filed)
albert.myers@ksfcounsel.com
Lewis S. Kahn (*pro hac vice* application to be filed)
lewis.kahn@ksfcounsel.com
Melinda A. Nicholson (*pro hac vice* application to be filed)
melinda.nicholson@ksfcounsel.com
Christopher W. Kaul (*pro hac vice* application to be filed)
chris.kaul@ksfcounsel.com
206 Covington Street
Madisonville, Louisiana 70447
Telephone: (504) 455-1400
Fax: (504) 455-1498

*Attorneys for Plaintiff*

## **VERIFICATION**

I, Russell Partch, declare under penalty of perjury that I have reviewed the foregoing Shareholder's Derivative Complaint, and I authorize its filing.  I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason I believe them to be true.

_____
Russell Partch

_____
Date  1-11-2012